**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CONNIE BELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 11-0042-WS-N** |
| | ) | |
| **CROWNE MANAGEMENT, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 38). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 39-40, 43-47, 52), and the motion is ripe for resolution. After carefully considering the foregoing, the Court concludes that the motion for summary judgment is due to be granted.

## BACKGROUND

The plaintiff was employed by the defendant as a certified nursing assistant ("CNA") at the defendant's nursing home facility in Brewton. She was terminated in May 2008 after hitting a co-employee on the head with a book. The plaintiff, who is black, alleges that her termination was based on racial discrimination in violation of Title VII and Section 1981.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell,* 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor,* 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins,* 228 F.3d at 1313; *Clark,* 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick,* 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark,* 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003).

The parties have submitted a number of exhibits, some of which they have not referenced in their briefs or have referenced only in part.[1]  There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Accordingly, the Court limits its review to the exhibits, and the specific portions of the exhibits, which the parties have expressly cited.[3]

Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

---

[1] By local rule, "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response."  Local Rule 5.5(c).  The same rule applies to depositions.  *Id*. Rule 5.5(b).  The parties were cautioned in advance to comply with these rules.  (Doc. 13 at 6).

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

[3] The plaintiff failed to actually file a good bit of her evidentiary material, including Exhibits 1-10.  Opposition to summary judgment must be based on materials "in the record."  Fed. R. Civ. P. 56(c)(1)(a), (2).  While the plaintiff submitted much (but not all) of her evidentiary material, including Exhibits 1-10, to chambers as a courtesy copy, material delivered to a judge rather than to the clerk is not "filed" unless the judge "agrees to accept it for filing."  *Id*. Rule 5(d)(2)(B).  The Court did not agree to accept the plaintiff's courtesy copies for filing, and the courtesy copies (to the extent not redundant with the filed submission) are thus not part of the record and cannot form the basis of a denial of summary judgment.  *See Fisher v. Ciba Specialty Chemicals Corp*., 238 F.R.D. 273, 278 n.4 (S.D. Ala. 2006) ("Extraneous material set forth in the courtesy copy is not part of the record and will not be reviewed or relied on in any way herein."); *accord United States v. Miller*, 395 F. Supp. 2d 875, 877 n.2 (D.N.D. 2005).  The plaintiff's lapse is not outcome-determinative.  The Court has reviewed (to the extent cited by the plaintiff in her brief) the materials delivered to chambers but not filed, and they would not alter the Court's ruling on the merits of the defendant's motion.

"In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Services, Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998). The plaintiff relies on the first two of these avenues.[4]

## I. Direct Evidence.

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard*, 161 F.3d at 1330.[5] "Therefore, … remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id*. Specifically, " [a] biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination." *Williamson v. Adventist Health System/Sunbelt, Inc*., 372 Fed. Appx. 936, 940 (11th Cir. 2010)

As her direct evidence, the plaintiff relies on an alleged statement by the white administrator of the Brewton facility, Mark Manning, in 2004 or 2005[6] to the effect that he had some good n-----s working at the facility. (Doc. 44 at 7-9, 17-19). Manning's alleged comment was not made in the context of an employment decision concerning the plaintiff but was made at his home some three or four years earlier, without even a reference to the plaintiff. Multiple inferences and presumptions would be required to

---

[4] Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework." *Standard*, 161 F.3d at 1330. Thus, the Title VII analysis applies as well to Section 1981. *Springer v. Convergys Customer Management Group, Inc*., 509 F.3d 1344, 1347 n.1 (11th Cir. 2007) (circumstantial evidence); *Ferrill v. Parker Group, Inc*., 168 F.3d 468, 472 (11th Cir.1999) (direct evidence); *Standard*, 161 F.3d at 1330 (both). The parties request no differing treatment of the two claims.

[5] The classic example is, "Fire Earley – he is too old." *Merritt v. Dillard Paper Co*., 120 F.3d 1181, 1190 (11th Cir. 1990).

[6] The plaintiff's evidence is that this statement was made in the immediate aftermath of a hurricane – either Ivan (September 2004), Katrina (August 2005), or Rita (September 2005).

bridge the gap between his alleged statement and the decision to terminate the plaintiff, and the statement therefore cannot constitute direct evidence of discrimination.[7]

## II. Circumstantial Evidence.

In Title VII cases not based on direct evidence, the burden is first on the plaintiff to establish a prima facie case. If she succeeds, the employer must meet its burden of articulating one or more legitimate, nondiscriminatory reasons for the adverse employment action. If it does so, the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for illegal discrimination. *E.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). As discussed below, the plaintiff cannot establish a prima facie case and therefore cannot survive summary judgment.

---

[7] Racial slurs that do not rise to the level of direct evidence may nevertheless be considered as circumstantial evidence of discriminatory intent. *E.g., Gillis v. Georgia Department of Corrections*, 400 F.3d 883, 885 n.5 (11th Cir. 2005); *Standard*, 161 F.3d at 1331. As the defendant points out, however, the plaintiff has no admissible evidence that Manning made the alleged statement. "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In such an event, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id*. official commentary 2010 amendment.

None of the witnesses on whom the plaintiff relies heard Manning make the alleged statement. Most heard it as rumor circulating around the workplace, while the plaintiff and one other witness state they heard employee Wayne Higdon say he heard Manning make the statement at Manning's home. Higdon denies ever hearing such a statement by Manning. (Higdon Deposition at 22). Thus, the plaintiff offers her testimony and that of another witness to show what Higdon (the declarant) said (that Manning used the "N" word), for the purpose of proving the truth of what Higdon said (that Manning in fact used the "N" word). This is classic hearsay, Fed. R. Evid. 801(c), and it is inadmissible. *Id*. Rule 802. The defendant pointed all this out, (Doc. 39 at 24), yet the plaintiff ignored the hearsay issue in her response. She therefore failed to shoulder the burden that Rule 56(c)(2) places on her, and Manning's alleged statement consequently cannot be considered on motion for summary judgment, either as direct or as circumstantial evidence.

## A. Comparator.

"To establish discrimination in discipline, ... a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline." *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *accord Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). This formulation has been applied when the discipline meted out is termination,[8] and the parties agree that it applies here. (Doc. 39 at 8; Doc. 44 at 20, 23).

The defendant attacks the third element of the prima facie case. "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, ... we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotes omitted); *accord McCann v. Tillman*, 526 F.3d 1370, 1373-74 (11th Cir. 2008).[9] The parties agree that this degree of similitude is required. (Doc. 39 at 9; Doc. 44 at 24, 28). An examination of the plaintiff's conduct and that of her two comparators is thus required.

On or about May 20, 2008, the plaintiff and fellow CNA's Alicia Peavy and Michelle Booker were in the dining room with several residents and at least one guest. According to the plaintiff's contemporaneous statement, Peavy kept talking about how a

---

[8] *E.g, Burke-Fowler v. Orange County*, 447 F.3d 1319, 1322-23 (11th Cir. 2006); *Maniccia v. Brown*, 171 F.3d 1364, 1366, 1368 (11th Cir. 1999).

[9]*Burke-Fowler* invoked the "prior panel precedent" rule to select the "nearly identical" standard rather than the seemingly lower standard of "similar[ity]" articulated in some Eleventh Circuit opinions. 447 F.3d at 1323 n.2.

resident had wet herself, implying the plaintiff was responsible.  The plaintiff asked Peavy to leave, but instead Peavy walked over to the plaintiff and hit her on the forehead with her hand, and "before I even knew it, I hit her back with the Avon book."  (Doc. 39, Exhibit B to Exhibit 1).

Manning made the decision to terminate the plaintiff.  He states that he terminated both the plaintiff and Peavy (who is also black) because they engaged in a physical altercation and did so in front of both residents and a guest, in violation of the defendant's work rule permitting immediate discharge for "[f]ighting, threats, intimidation, or argumentative behavior."  (Doc. 39, Exhibit 1 at ¶ 13 and Exhibits C, I thereto).

The plaintiff scrambles to retreat from her statement, now calling the contact between her book and Peavy's head a mere "tap."  But Manning considered six statements in determining the plaintiff's conduct and punishment, and five of them describe the plaintiff's strike as a "hit."  This includes:  (1) the plaintiff's own statement; (2) Peavy's statement; (3) the statement of eyewitness Booker; (4) the statement of Angie Sessions, to whom the plaintiff stated, immediately after the incident, that she had hit Peavy; and (5) the statement of Kim Shell, to whom Peavy stated, immediately after the incident, that the plaintiff had hit her.  (Doc. 39, Exhibit B to Exhibit 1).  Only the guest had a different version, describing the contact as a slight "pop," and she stated clearly that she sought to avoid saying anything that might cost either participant her job.  (*Id*.). Moreover, Booker stated that it was obvious from the contact between the plaintiff's book and Peavy's head that the plaintiff was serious, (*id*.), which is inconsistent with a mere tap.  The plaintiff's revisionist history is interesting, but what matters when comparing the misconduct of employees in a discrimination suit are the facts of each incident as they appeared to the decision-maker at the time discipline was administered, not those that are asserted years later.  For purposes of this inquiry, the plaintiff did not merely tap Peavy but hit her on the head with a book.

It would seem obvious that such conduct is inappropriate, but the plaintiff insists she was merely defending herself against Peavy. No such position appears in her contemporaneous statement or in any of the other statements on which Manning relied, and nothing therein supports the proposition. The plaintiff may have had no thought of hitting Peavy before Peavy hit her, but nothing in the statements or even in the recent depositions suggests that Peavy posed a continuing threat to her. The plaintiff may have acted "reflexively," as she asserts, but the reflex was retaliation, not self-defense. Because no claim or evidence of self-defense was presented to Manning, for purposes of comparing the plaintiff's misconduct with that of other employees she did not act in self-defense.

To the average person, a deliberate exchange of blows to the head would seem to fit comfortably within the contemplation of the term "fighting." In the plaintiff's estimation, however, the term requires "struggling and tussling," such that she and Peavy are innocent of fighting. This is another engaging but pointless sideshow. The merits of her definition aside, at issue here is whether the plaintiff's misconduct and that of two white employees who were not terminated was nearly identical, not the proper denotation of that conduct. But for what it is worth, fighting it plainly was.

Finally, the plaintiff asserts that Manning never said she was being terminated for fighting. But she was certainly terminated for the May 20 dining room incident, as the termination report Manning signed (and the plaintiff refused to sign) makes explicit. (Doc. 39, Exhibit C to Exhibit 1). It is thus that conduct to which the comparators' conduct must be compared. To those incidents the Court now turns.

In February 2008, white CNA Machelle White was cursed and yelled at by her visiting sister, Donna Tullis, regarding the biracial nature of White's child. The defendant obtained seven statements, five of which reported no knowledge of the incident. The statements of an LPN supervisor and a disinterested guest placed the blame for the incident squarely on Tullis, not on White, and they indicated no misbehavior by White. (Doc. 39, Exhibit D to Exhibit 1; *id*., Exhibit 2 to Exhibit 9). Tullis reported to

Manning that White had verbally assaulted her and made threats of bodily harm, and that co-workers had restrained White from a physical altercation. (Doc. 44, Exhibit 7). Manning credited the accounts of the supervisor and the guest over the self-interested account of Tullis, and White was not disciplined. (Doc. 39, Exhibit 1, ¶¶ 15-20).

On motion for summary judgment, the plaintiff asserts she has evidence from three witnesses that White screamed threats and profanities at Tullis and that she had to be physically restrained by other employees to prevent her from physically attacking Tullis. The Court assumes for present purposes that this version of the episode is accurate.[10] The Court also assumes for present purposes that Manning was aware in February 2008 that this version of the episode was accurate.[11]

The problem for the plaintiff is that, under even her version of events, White did not strike Tullis, and yelling, cursing and wanting to hit another is not conduct "nearly identical" to actually hitting the other. In *Floyd v. Federal Express Corp.*, 423 Fed. Appx. 924 (11th Cir. 2011), the plaintiff was fired because he took a swing at his comparator, who may or may have not been dealt a glancing blow. The comparator cursed the plaintiff and pointed his finger in the plaintiff's face without intending to hit him. The Eleventh Circuit ruled that the comparator's conduct was not nearly identical to the plaintiff's. *Id.* at 930-31. In light of *Floyd*, White's non-physical conduct cannot be considered nearly identical to the plaintiff's battery.

---

[10] At least part of it plainly is not, even gauged by the evidence the plaintiff cites, as none of her witnesses claim to have seen White try to attack Tullis. At most, they heard White arguing loudly, saw her being pulled or pushed into another room by co-employees, and helped keep her there until she calmed down.

[11] "Employees are not 'similarly situated' if management is aware of one's improper conduct, but not aware of the others' conduct." *Amos v. Tyson Foods, Inc.*, 153 Fed. Appx. 637, 647 (11th Cir. 2005); *accord Summers v. City of Dothan*, 2011 WL 4376015 at *4 (11th Cir. 2011); *cf. Jones*, 874 F.2d at 1542 (for his prima facie case, the plaintiff must show that his comparators' "known violations were consciously overlooked").

Undeterred, the plaintiff notes that, while being detained by co-employees, White slung an employee across the bed in her effort to leave the room and approach Tullis. (Doc. 44 at 26). The employee, however, admits that she never told Manning about this, (Nettles Deposition at 20-21), and the plaintiff has identified no witness that did so. Because, as discussed in note 11, *supra*, only conduct known to the decision-maker is relevant to whether a comparator is similarly situated, the episode does not assist the plaintiff.[12]

In May 2005, white CNA Myah Gillis was accosted by two black CNA's in a resident's room over a work dispute. The defendant interviewed the resident and obtained statements from the three CNA's and the LPN supervisor. The resident stated that one CNA, swearing loudly, cornered Gillis and pushed on her but that Gillis climbed over the resident's bed in an effort to escape. The resident stated that the second CNA, also swearing loudly, blocked the door and would not allow Gillis to leave the room. In the course of exiting the room, Gillis fell and was injured enough to require treatment at a hospital. Gillis's statement paralleled that of the resident, and the statements of the black CNA's confirmed that they yelled at Gillis and blocked her exit. (Doc. 39, Exhibits E-G to Exhibit 1). In reliance on these statements, Manning terminated the black CNA's but did not discipline Gillis. (*Id*., Exhibit 1, ¶¶ 21-26 and Exhibit H thereto).

The plaintiff argues that Gillis's conduct was nearly identical to her own because the first CNA stated that Gillis "pushed past" the CNA blocking the door "and almost knocked her down." This, if it occurred,[13] is at least a physical contact, but it is worlds removed from the plaintiff's conduct. Gillis's contact was pursuant to her escape from a

---

[12] The plaintiff stresses evidence that White was pushed and/or pulled by co-workers into a room, away from Tullis. This may be physical contact, but it is contact by others with White, not contact by White with others.

[13] The second CNA, who allegedly was pushed, did not mention it in her statement. Nor did the resident.

threatening situation,[14] while the plaintiff's contact was not an act of escape but of retaliation.  The plaintiff was fighting; Gillis, in contrast, was purposefully *avoiding* a fight.  Her incidental contact with the second CNA is thus not conduct nearly identical to that of the plaintiff.

The plaintiff argues that the conduct of White and Gillis must be nearly identical to her own because:  (1) all three engaged in "fighting" in violation of the defendant's work rule; (2) Manning described all three incidents as "altercations"; (3) none of the three was the aggressor; (4) none did anything to escalate the altercation; and (5) residents and guests witnessed all three incidents.  (Doc. 44 at 25-26).

In order to accuse White and Gillis of fighting, the plaintiff asserts that any physical contact between two human beings constitutes fighting.  (Doc. 44 at 24).[15] According to the plaintiff, then, shaking hands and kissing constitute fighting.  On the job, taking a resident's temperature and helping him stand also constitute fighting.  This is facially absurd and deserving of no further consideration.

But, the plaintiff insists, Manning himself admits that hers is the correct definition of fighting.  (Doc. 44 at 24).  He has done no such thing.  While Manning interpreted fighting as entailing physical contact between individuals, his examples of such contact are hitting, biting, scratching and slapping.  (Manning Deposition at 122).  White and Gillis did not engage in such activity.

Manning also testified that fighting depends on the person's intent, (Manning Deposition at 123), and "fighting" has been defined as a "hostile encounter."  <u>Merriam Webster's Collegiate Dictionary</u> 434 (10th ed. 1993).  Perhaps White was hostile towards Tullis, but there was no physical contact and thus no fighting.  White may have slung one

---

[14] The plaintiff admits that Gillis felt threatened and was attempting to exit the room. (Doc. 44 at 5-6).

[15] Essentially the opposite of her simultaneous insistence that fighting is limited to struggling and tussling.

[11]

of her co-employees on a bed as they kept her separated from Tullis, but the plaintiff's own witnesses admit she was not hostile towards her guardians. (Nettles Deposition at 13; Hawthorne Deposition at 26).[16] Gillis was not hostile but afraid, seeking only an escape from the hostility of others, as the plaintiff admits. *See* note 14, *supra*. The plaintiff, in stark contrast, struck Peavy as an act of retaliation.

Even if some odd definition of "fighting" could be constructed that would capture the conduct of White and Gillis, once again it must be stated that the relevant inquiry is not whether the conduct of the comparators and the plaintiff fall within some common semantic umbrella but whether the conduct is nearly identical in its quality and quantity.[17] Likewise, that Manning has described each incident as an altercation does not magically transform these very different situations into nearly identical ones.

That none of the three was the aggressor provides a point of similarity, as does the identity of the witnesses, but "[m]isconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008). The plaintiff's suggestion that she did nothing to escalate the situation works only if one ignores the rather critical fact that she hit Peavy on the head with a book. At that point – as any parent of squabbling children will attest – she became as guilty as Peavy.

In short, the conduct engaged in by the plaintiff's comparators is not nearly identical to her own (or even close). She therefore cannot avoid summary judgment under the standard formulation of the prima facie case governing a claim of discriminatory discipline.

---

[16] Again, this conduct is irrelevant because there is no evidence that Manning was aware of it.

[17] A knife through the ribs and a fingernail scratch on the arm are both examples of fighting, but who would consider the scratch nearly identical to the stabbing?

## B.  Other Evidence of Discriminatory Intent.

The plaintiff argues that, even if White and Gillis are not legitimate comparators, she has presented other evidence sufficient to ward off summary judgment.  (Doc. 44 at 21-23, 33, 40).  In particular, she cites to the EEOC's finding of cause to believe that a Title VII violation occurred, to one perceived instance of race discrimination (and one of retaliation) against her, and to numerous perceived instances of race discrimination against other black employees.  (*Id*. at 27, 33-36).[18]

The plaintiff quotes, without attribution, from *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321 (11th Cir. 2011).  "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and was never intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.  …  Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id*. at 1328.

To the extent that *Smith* suggests the burden-shifting paradigm of *McDonnell Douglas* can be ignored in a case based on circumstantial evidence, freeing the plaintiff from any obligation to establish a prima facie case, it is in tension with a long line of Eleventh Circuit precedent.[19]  It is to that extent also in tension with *McDonnell Douglas*

---

[18] The plaintiff, appropriately, does not invoke Manning's alleged use of the "N" word as circumstantial evidence.  As demonstrated in note 7, *supra*, the plaintiff has no admissible evidence of such use and therefore cannot rely on it.

[19] *See, e.g., Alvarez v. Royal Atlantic Developers, Inc*., 610 F.3d 1253, 1264 (11th Cir. 2010) ("Lacking direct evidence, Alvarez must prove her discrimination claim circumstantially. We evaluate such claims using the framework established by the Supreme Court in [*McDonnell Douglas* and *Burdine*, and] [u]nder that framework the plaintiff must first establish a prima facie case of discrimination …."); *Brown v. Department of Transportation*, 597 F.3d 1160, 1174 (11th Cir. 2010) ("A plaintiff bears the burden of establishing a prima facie case of discrimination in Title VII cases that are supported by circumstantial evidence."); *Burke-Fowler*, 447 F.3d at 1323 ("Racial discrimination claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden shifting framework."); *Spivey v. Beverly Enterprises, Inc*., 196 F.3d 1309, 1312 (11th Cir. 1999) ("In order to prevail on a disparate treatment claim based on circumstantial evidence, Appellant is required to first establish a prima facie case …."); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) ("When a plaintiff attempts to prove
(Continued)

itself: "The complainant in a Title VII trial *must* carry the initial burden under the statute of establishing a prima facie case of racial discrimination." 411 U.S. at 802 (emphasis added); *accord Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576 (1978).[20]

---

intentional discrimination in violation of Title VII using circumstantial evidence, we apply the now familiar shifting burden framework established by the Supreme Court in [*McDonnell Douglas* and *Burdine*, and] [u]nder that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination."); *Standard*, 161 F.3d at 1333 ("In the absence of direct evidence, we must proceed with the *McDonnell Douglas* analysis ...."); *Walker v. Mortham*, 158 F.3d 1177, 1183 (11th Cir. 1998) (*McDonnell Douglas* sets forth a framework of burdens "that a Title VII plaintiff must satisfy to obtain judgment in her favor if she possesses only circumstantial evidence of discrimination"); *Arrington v. Cobb County*, 139 F.3d 865, 873 (11th Cir. 1998) ("Since Arrington has produced no direct evidence that appellees harbored an illegal motive for refusing her the Deputy Chief position, she must rely on the test set out in *McDonnell* to establish her prima facie case of discrimination through circumstantial evidence."); *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996) ("To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case ...."); *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994) ("To present a circumstantial case of discrimination, a plaintiff must first establish a prima facie case."); *Green v. School Board*, 25 F.3d 974, 978 (11th Cir. 1994) ("When a plaintiff's evidence is circumstantial, ... the plaintiff must create an inference of discrimination by establishing a prima facie case ....").

[20] The Seventh Circuit, on which the *Smith* panel relied, has apparently chosen another path. *See Silverman v. Board of Education*, 637 F.3d 729, 733-34 (7th Cir. 2011) (a plaintiff alleging disparate treatment may avoid summary judgment in any of three ways: (1) with direct evidence of discriminatory intent; (2) under the *McDonnell Douglas* method; or (3) with various forms of circumstantial evidence. Whatever leeway the Supreme Court may have left for this third option, it is doubtful that the Eleventh Circuit has done so. To the extent the statements quoted in the previous note, or the many more like them, constitute holding, the *Smith* panel could not properly rule otherwise. *E.g., United States v. Sneed*, 600 F.3d 1326, 1332 (11th Cir. 2010) ("Under that rule [the "prior panel precedent" rule], "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.").

Better established is the view that the elements of the prima facie case can be modified. *McDonnell Douglas* itself acknowledged that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13; *accord Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("[T]he precise requirements of a prima facie case can vary depending on the context …."). Thus, the Eleventh Circuit has "repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

The *Schoenfeld* Court cited as an example of this flexibility *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991), which listed three alternative statements of the fourth element in a discharge case. *Id.* at 1525 (replacement by one outside the protected category, retention of comparably qualified employees, or retention of employees with similar disciplinary histories). Similarly, the Court in *Rioux v. City of Atlanta* allowed the plaintiff, who could not produce a nearly identical comparator after he was demoted as a disciplinary measure, to establish a prima facie case by showing that his replacement was of a different race. *Id.* at 1275-77. These were measured tweakings of classic formulations of the prima facie case, substituting one reasonably precise element with another, similarly precise element. But they do not aid the plaintiff, who makes no claim that she was replaced by a non-black CNA.

The Eleventh Circuit has, however, opened the door to less structured alterations of the prima facie case. According to *Schoenfeld*, "'[a] prima facie case of disparate treatment can be established by any proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'" 168 F.3d at 1268 (quoting *Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1540 (11th Cir. 1988)). According to *Smith*, "[a] triable of issue of fact exists if the record, viewed in a light most favorable to the

plaintiff, presents a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  644 F.3d at 1328 (quoting S*ilverman v. Board of Education*, 637 F.3d 729, 734 (7th Cir. 2011)).  The plaintiff believes that these pronouncements and others allow her to establish a prima facie case with whatever marginal evidence she finds available.[21]

It cannot easily be concluded that the Eleventh Circuit has carefully constructed a strict, "nearly identical" standard for satisfying the third element of the prima facie case for a claim of discriminatory discipline only to allow that element to be freely substituted with, and satisfied by, any weak, amorphous whiff of discrimination.  "The prima facie case serves an important function in the litigation:  it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).  This purpose "retains equal validity where discriminatory discipline is alleged" and directly underlies the comparator element of the standard prima facie case.  *Jones*, 874 F.2d at 1539.  When a plaintiff cannot draw into question the most obvious nondiscriminatory reason for unequal treatment (i.e., unequal misconduct), any substitute evidence must be comparably powerful in order to preserve to the prima facie case its gate-keeping function as ordained by the Supreme Court.

It must therefore be assumed that any evidence offered under *Schoenfeld* and *Smith* in lieu of a nearly identical comparator must suggest discrimination with force

---

[21] The plaintiff relies on two additional isolated quotes to support her lax view of the prima facie case.  "If the plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "Because she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination, Burke-Fowler did not establish a prima facie case of race discrimination."  *Burke-Fowler*, 447 F.3d at 1325.  The term "no other evidence" as used in these cases cannot be read to mean that any evidence whatsoever is sufficient to establish a prima facie case and avoid summary judgment, especially since both *Holifield* and *Burke-Fowler* ruled that the plaintiff's proffered "other evidence" did not support a prima facie case.  115 F.3d at 1563-64; 447 F.3d at 1325-26.

similar to that implied by treating nearly identical offenders differently.  This is consistent with *Smith*'s requirement of a "convincing mosaic" of evidence and with *Schoenfeld*'s requirement that the prima facie case be grounded on evidence making it more likely than not that the adverse employment action was based on illegal discrimination.  The plaintiff's proffered evidence does not come close to meeting this standard.

The EEOC determination, (Doc. 46, Exhibit 23), is based exclusively on the agency's assessment of White's conduct as compared with the plaintiff's.  It is therefore not different evidence at all but only a spin on the comparator evidence and thus not relevant to an "other evidence" evaluation.[22]

None of the remainder of the plaintiff's proffered evidence has anything to do with her termination.  Instead, she asserts that a written warning she received eight months before her termination was the product of race discrimination and retaliation.  She asserts in addition that she and other black employees perceive discriminatory conduct and attitudes in various aspects of employment at the defendant's Brewton facility.  That is, the plaintiff asks the Court to accept that, although she has no evidence that her termination was based on her race, she can nevertheless establish a prima facie case under *McDonnell Douglas* with adequate evidence that other employment decisions – most not even involving her – were based on race.  Assuming without deciding that a plaintiff may theoretically establish a prima facie case in such a manner, the plaintiff has not done so here.

------

[22] The EEOC determination is also incorrect.  It did not employ the "nearly identical" standard but instead was based only on the fact that both the plaintiff and White violated the same work rule.  As noted in text, that rule prohibits not only fighting but also argumentative behavior.  White may have engaged in the latter, but she plainly did not engage in the former, and the mere fact that these two very different forms of misconduct appear in the same rule furnishes no proper grounds for deeming them equivalent.  *See Floyd*, 423 Fed. Appx. at 930-31 (that fighting and profanity appeared in the same provision did not render profanity nearly identical to fighting).

The plaintiff received a written warning in September 2007 for not responding to a call light signifying a resident's request to be fed and for then engaging in rude and discourteous behavior by arguing with the resident about who turned off the call light without responding.  (Doc. 46, Exhibit 5 at WES-B000388).  The plaintiff says she did not respond because she was dealing with another resident who had soiled himself, and she says she was not arguing but merely correcting (repeatedly) the resident's misstatement that she had turned off the call light.  (Bell Deposition at 164-68).  The plaintiff admits that the resident complained she "got out of line," (*id*. at 165), but she denies that she did so.  Her only basis for believing the write-up was discriminatory is that her version of the encounter exonerated her and so there could be no non-discriminatory reason for disciplining her.  (*Id*. at 168-69).[23]

In resolving disputes, employers routinely must credit one version of events over another.  The mere fact that an employer credits the customer's version over that of the employee is not of itself evidence that the employer harbored a discriminatory intent.  In substance, the plaintiff has nothing but her subjective belief that she has been discriminated against, and "[h]er opinion, without more, is not enough to establish a prima facie case of race discrimination."  *Holifield v. Reno*, 115 F.3d 1155, 1564 (11th Cir. 1997).

The plaintiff says she has evidence that whites were not disciplined under similar circumstances, but the only incident she describes did not involve rudeness to a resident but a failure to change a dressing.  (Riley Deposition at 100-01).  The plaintiff, prudently, does not assert that the white employee engaged in conduct nearly identical to her own, but this lack of similarity prevents the plaintiff from inferring discrimination from the difference in treatment.  Moreover, neither Manning nor the nurses who signed off on her

---

[23] The plaintiff notes that two LPN's were in the room, and she speculates that they would have written her up if she had truly gotten out of line.  (Bell Deposition at 167).  But for all that appears, it was the LPN's who reported the plaintiff to the superiors who administered the discipline.

written warning were involved in the dressing incident, (*id.*), and "[d]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001).

The plaintiff also believes that her written warning was issued in retaliation for her refusal to falsely accuse a fellow black employee of fault in connection with a resident's broken hip. Retaliation is not discrimination, so it is difficult to see how this allegation could support the plaintiff's case even if it were valid. Moreover, the plaintiff has no evidence of a causal connection between her refusal and her written warning; she offers no evidence of how much time passed between her refusal and the warning she received, and she offers no alternative evidence that her refusal prompted the warning.[24] She also concedes that Manning only asked her to tell the truth. Finally, she admits she has no reason to believe that Manning sought to lay blame on the black employee simply because the employee was black. (Bell Deposition at 172-73, 373, 375).

In summary, the plaintiff's feeble effort to show that she has been the victim of race discrimination and/or retaliation on other occasions has no pulse. Since she cannot show that she experienced discrimination or retaliation on other occasions, she cannot use such non-existent discrimination or retaliation to extrapolate that her termination was based on discrimination.

This leaves for consideration the opinions of the plaintiff and a number of her co-employees that race discrimination has infected various aspects of employment at the defendant's Brewton facility. The plaintiff cites no case approving the use of such "me,

---

[24] "The burden of causation [in a Title VII retaliation case] can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough," and "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.*

too" evidence as an alternate means of establishing a prima facie case under *McDonnell Douglas*. On the contrary, the plaintiff in *Holifield* attempted to satisfy his prima facie case by "rel[ying] on the perception of other employees … that racism is present at the institution," but "[n]one of these employees spoke of incidents of discrimination concerning" the plaintiff. 115 F.3d at 1563. The Court ruled that, although this evidence "supports the conclusion that incidents of discrimination on the basis of race have occurred at FCI Marianna," it "does not support an inference that Holifield was discriminated against on the basis of his race when he was reassigned … or when he was terminated." *Id*. at 1564.

Even when offered to show pretext rather than a prima facie case, "me, too" evidence is suspect. To be probative, the other incidents must implicate a common decisionmaker. *Goldsmith v. Bagby Elevator Co*., 513 F.3d 1261, 1286 (11th Cir. 2008). "More generally, courts are reluctant to consider 'prior bad acts' in this [employment discrimination] context where those acts do not relate directly to the plaintiffs." *Denney v. City of Albany*, 247 F.3d 1172, 1189 (11th Cir. 2001). When the evidence involves a kind of alleged discrimination different from that alleged by the plaintiff, "the evidence [may be] likely to confuse the issues for the jury and unfairly prejudice the defendants." *Lewis v. Department of Transportation*, 187 Fed. Appx. 961, 961-62 (11th Cir. 2006) (upholding the exclusion of prior instances of discrimination against others, in part because the plaintiff claimed failure to promote, not retaliation or hostile work environment); *accord Chavis v. Clayton County School District*, 147 Fed. Appx. 865, 866-68 (11th Cir. 2005) (upholding the exclusion of other instances of discrimination against others, because the plaintiff claimed retaliation and the other instances involved failure to promote). For these and other reasons discussed below, the "me, too" evidence offered by the plaintiff and her witnesses is woefully inadequate to compensate for her failure to identify a proper comparator.

The plaintiff's best shot is her evidence that two black CNA's engaged in a "verbal altercation" in 2005 or 2006 and were terminated by Manning. (Riley Deposition

at 109-11).  Although the plaintiff does not connect the dots, she could argue that White and Gillis should likewise have been terminated for arguing.  However, the plaintiff provides no specifics concerning this incident, so it is impossible to conclude that the conduct of the black CNA's was nearly identical to, or even substantially similar to, that of White and Gillis, and without such evidence the difference in their treatment does not imply the presence of racial discrimination.

Similarly, the plaintiff notes that, while two black CNA's were suspended pending investigation into abuse of a resident, a white CNA whom a resident accused of slapping her was not suspended pending the ensuing investigation.  (Riley Deposition at 115-16).  Again, however, the plaintiff offers no details regarding the allegations against the three, so it cannot be concluded that the allegations were substantially similar in seriousness or in likely merit.[25]  On the contrary, since the black CNA's were ultimately terminated while the white CNA was not, the implication is that the conduct of the former was more serious and their guilt more obvious.

From there, the plaintiff's case goes swiftly downhill.  She returns to the white LPN who escaped discipline for not changing a dressing, and she asserts that a black LPN was disciplined for the same infraction.  (Riley Deposition at 100-02).  Once again, the plaintiff provides no details concerning the incidents, so it cannot be said they were nearly identical, only that they involved the same general issue.  Moreover, Manning was not involved in the decisions to discipline the black and not to discipline the white.  (*Id*.).

The plaintiff also revisits the black employee suspected of fault in connection with a resident's broken hip.  As noted, however, the plaintiff admits she has no basis to

---

[25] This is not to say that slapping a nursing home resident would be a trivial matter, only that there is no way to tell that the black CNA's did nothing more egregious, and no way to tell that the case against them was no more clear-cut (for example, corroborated by eyewitnesses beyond the alleged victim).

believe Manning suspected her because she was black.  (Bell Deposition at 375).[26]  Nor

has the plaintiff offered evidence that the employee was ever found guilty of, or

disciplined for, anything in connection with this incident, so it cannot be assumed that she

has experienced an adverse employment action.

The plaintiff cites to evidence that Wanda Riley was not made director of nursing

after several white nurses protested, (Riley Deposition at 93), but not to evidence that her

rejection stemmed from discriminatory intent by Manning.[27]

The plaintiff says that blacks, but not whites, are required to make up sick days,

but both her witnesses admit they have no personal knowledge of this and are relying

only on inadmissible hearsay.  (Bell Deposition at 152; Hubbard Deposition at 43-44).

Nor does the plaintiff offer evidence that Manning, as the administrator of a 129-bed

skilled nursing facility, (Doc. 44 at 3), is involved in the minutiae of making up sick days.

She says that a black was fired for sleeping on the job while a white was not, but again

she admits she has nothing but hearsay to go on.  (Bell Deposition at 152, 154).

In 2009, the defendant instituted a new policy prohibiting LPN's and CNA's from

taking vacation around the Thanksgiving and year-end holidays.  The policy applies

without distinction to whites as well as blacks, but Jacqueline Hubbard nevertheless

"feel[s]" it is discriminatory because RN's, who are mostly white, are not subject to the

policy.  (Hubbard Deposition at 50-51).  On its face, the policy treats similarly situated

---

[26] The plaintiff insists that a white employee who also tended the resident should have been investigated as well, but she admits she has no knowledge that this was not done.  (Bell Deposition at 174).

[27] Since the previous two directors of nursing were black, (Riley Deposition at 95), it is not apparent why Manning would refuse to place a black in that position.  Riley's theory is that he hired a white woman because they were friends.  (*Id.*).  As a matter of law, favoring an employee because of friendship is not favoring the employee because of race.  *E.g., Greene v. Potter*, 557 F.3d 765, 771 (7th Cir. 2009); *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1170-71 (10th Cir. 2007); *accord Caldwell v. State of Washington*, 278 Fed. Appx. 773, 776 (9th Cir. 2008).

employees similarly, not dissimilarly.  Moreover, the plaintiff identifies no evidence that Manning was involved in the development or approval of the policy.

Riley testified that, in March 2009, she uncovered evidence that five white nurses did not give a particular resident his medication for a contagious condition and that, when she informed Manning, he elected to treat it as a quality assurance matter while she believed it should have been a disciplinary matter.  (Riley Deposition at 38-56). However, the plaintiff offers no evidence that any similarly situated black has been treated differently and no evidence that Manning's response was based on racial rather than business or medical considerations.

On or about March 20, shortly after Riley raised her concerns, Manning held a meeting with the five white nurses.  On or about June 9 – four days after Riley reported the medication error to the Alabama Board of Nursing and just before Manning announced that the Board had opened an investigation – Manning held another meeting with the five white nurses.  Riley thinks her exclusion from these meetings was racist but cannot articulate how, (Riley Deposition at 78-84); neither can the Court.[28]  Nor is exclusion from a meeting an adverse employment action or anything remotely approaching one.

Hubbard takes offense that she has been required to reduce to writing critical comments she has made on the job about other employees.  (Hubbard Deposition at 70-75).  She offers no evidence that whites have been treated differently, and she has no reason for believing the practice is racially motivated except that she is black and the ones she has criticized, and the ones who require the written statements, are white.  She does not implicate Manning in this practice in any way.

---

[28] Riley first insisted that the June meeting included all white nurses, not just the five. She later conceded she does not actually know who was at the meeting, that she would not be surprised to learn it was only the five nurses, and that the meeting could well have been called to advise them of the impending Board investigation.  (Riley Deposition at 83).

The plaintiff says that Manning disciplines blacks based on what white employees tell him and without independent investigation. Neither of her witnesses (each of whom identifies only a single instance) offers any evidence that whites are treated any differently. (Hubbard Deposition at 65-68; Riley Deposition at 103-04).

The plaintiff complains that white RN's are placed in supervisory roles while equally qualified black RN's are not. Hubbard testified that two black employees became RN's but left employment when the defendant failed to offer them RN positions, while a white RN was later offered such a position. However, she does not know if any RN positions were available between the time the black employees became RN's and when they quit. She suspects the defendant would have created new RN positions had they been white, but as far as she knows the defendant has never created a position in order to retain or hire a white. (Hubbard Deposition at 54-59, 62-63). In short, she has no evidence of discriminatory placement of RN's. April Stanton had no problem with continuing to work as an LPN after becoming an RN, since no RN positions were available, but she resented being assigned as a medication nurse while a succession of white LPN's acted as shift supervisor. She provides no indication that being shift supervisor would be a promotion (such that not being one could be an adverse employment action), she admits she never complained about it or asked to be made shift supervisor, she identifies no similarly situated white treated better, and she offers no evidence that Manning was involved in making such assignments. (Stanton Deposition at 12-17, 44, 49).[29]

Hubbard believes that nurse Kim Watson scrutinizes her performance more closely than that of a white employee on the other end of the hall. This is just her

_____

[29] Simply positing that Manning "should know what is going on in [his] facility," (Stanton Deposition at 16), is scarcely evidence that the administrator of a 129-bed skilled nursing facility is aware of every picayune daily assignment of each employee.

"personal feeling," and in any event she offers no evidence that Manning has anything to do with Watson's scrutiny. (Hubbard Deposition at 101-04).

Stanton is unhappy that she has more trouble getting overtime hours than white employees, and she thinks this is true of other blacks. But it is the scheduling nurse that sets the schedules, and she does not know if Manning is even aware of the overtime distribution. (Stanton Deposition at 21-23, 52-58).[30]

The plaintiff asserts race discrimination in the early distribution of paychecks, but her witness attributes the only example of a white receiving a paycheck early to "favoritism," not race. (Booker Deposition at 36-38).

Finally, Riley complains that Manning gave her a verbal warning for speaking her mind at a meeting of RN's, announcing that "the on-call pay sucks." She identifies only one white employee who spoke her mind, but even this employee did not say that anything "sucks," and Riley does not know whether the employee was reprimanded for whatever it was that she did say. (Riley Deposition at 87-91).

In summary, the plaintiff submits almost no colorable evidence of race discrimination at the defendant's facility, and even that pittance cannot be laid at the feet of Manning, the decision-maker behind her termination. Assuming without deciding that a prima facie case of discriminatory discipline can ever be grounded on "me, too" evidence, the crumbs presented by the plaintiff could not possibly form a satisfactory substitute for her failure to identify an appropriate comparator.

## CONCLUSION

The plaintiff's inability to establish a prima facie case of discrimination is fatal to her claims. For the reasons set forth above, the defendant's motion for summary

---

[30] The plaintiff's brief mentions an incident allegedly reflecting discriminatory treatment of sponsors, (Doc. 44 at 35), but she has not submitted the deposition pages on which she relies. Nor is the treatment of sponsors relevant to the treatment of employees.

judgment is **granted**.  The plaintiff's complaint and amended complaint, and all claims asserted therein, are **dismissed with prejudice**.  Judgment will be entered accordingly by separate order.

DONE and ORDERED this 5th day of January, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE